UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
EFREM RUSSELL,

                        Petitioner,                **10-CV-0585(TCP)**

     -against-

                                           **MEMORANDUM**
                                         **AND ORDER**

PHILIP D. HEATH, Superintendent, Sing Sing
Correctional Facility,

                        Respondent.
-----------------------------------------------------------------X
PLATT, District Judge.

       Before the Court is Efrem Russell's ("petitioner") petition pursuant to 28 U.S.C. § 2254

for a writ of habeas corpus. For the reasons that follow, petitioner's application is hereby

**DENIED**.

## I. BACKGROUND

**A.**      **Facts**

      **1.**      **Introduction**

       Between April and October of 2005, home invasion robberies were committed in Lake

Success, New Hyde Park, Oceanside, Manhasset and Plainview, New York.[1]   This string of

home invasions, called the "Pattern 13" robberies, was believed to have been committed by the

same group of people because they all occurred late at night in middle or upper-middle class

neighborhoods.  The perpetrators always entered the homes through an unlocked window, with

two or three of the perpetrators usually wearing masks, who then awakened the victims and

robbed them at gunpoint.

---

1. To the extent they are supported by the record, the facts are taken from the government's statement of facts in its opposition (DE 8 pp.13-19) and from the petitioner's exhibits attached to his petition.

In October of 2005, after a man named Eugene Elmore was linked to the robberies by DNA evidence and arrested, a confidential informant communicated with the police to advise them that a man named "Efrem" was an associate of Elmore and that "Efrem" had owned cars matching the description of cars that had been observed at the Lake Success and Manhasset robberies. The police obtained a warrant to search Elmore's cellular telephone ("cell phone") directory where they found three telephone numbers belonging to petitioner Efrem Russell.

Further investigation revealed that petitioner had owned cars exactly matching the descriptions of the cars that had been observed in connection with the robberies. The confidential informant identified a photograph of petitioner as the "Efrem" to whom she had referred. The Electronics Squad of the police department discovered that petitioner's cell phone had been used in the vicinity of the Manhasset robbery shortly after the robbery occurred. Petitioner was arrested in Brooklyn and transported to the Robbery Squad of the Nassau County Police Department, where police questioned him after petitioner waived his *Miranda* rights. Subsequently, three of the victims of the Oceanside and Plainview home invasions identified petitioner in a photo array and a lineup.

Petitioner was indicted and pled guilty to the two indictments in their entirety. The indictments alleged: five counts of burglary in the first degree; three counts of robbery in the first degree; one count of attempted robbery in the first degree; four counts of robbery in the second degree; and one count of attempted robbery in the second degree, in connection with the Lake Success, Oceanside, Manhasset and Plainview home invasions.

## 2. The Suppression Hearing

Prior to trial, petitioner alleged that the police did not have probable cause to arrest him.

Consequently, he moved to suppress the admission into evidence of a cell phone that was confiscated from his person incident to his arrest. Petitioner also moved to suppress evidence adduced from the photo array and lineup and all statements made to the police by him. Petitioner also alleged that police did not have probable cause to place a tracking device on his car. A combined *Mapp*, *Wade* and *Huntley* hearing was held between January 23, 2007 and January 29, 2007 before the Honorable Joseph C. Calabrese, Supreme Court, Nassau County, New York.

By written decision dated February 20, 2007, the court denied petitioner's motion to suppress in its entirety. Judge Calabrese held that police possessed the requisite probable cause to arrest petitioner, that the identification procedures were not unduly suggestive and that the witnesses' viewing of the photo array prior to the lineup had not rendered the lineup suggestive. Furthermore, the court held that all of petitioner's statements to the police were admissible.[2]

### 3. Petitioner's Guilty Plea and Sentence

On April 30, 2007, petitioner appeared in court to plead guilty. During his plea proceeding, petitioner stated that he was aware of his right to ask the court and his attorney questions about anything he did not understand. He told the court that he was forty-four years old, could read and write English and that he was a United States citizen. He told the court that he had not taken any alcohol or drugs in the prior twenty-four hours. Petitioner advised the court that he was satisfied with the representation provided by his attorney. The court advised petitioner of his trial rights and petitioner assured the court that he understood that he was relinquishing those rights by pleading guilty. Petitioner also assured the court that he understood

---

2. In his Decision and Order, Judge Calabrese also held that the tracking device was properly placed on petitioner's car after police obtained a warrant based on probable cause. That issue is not before the Court.

that a guilty plea had the same effect as a conviction after trial. Finally, petitioner stated that no one had threatened or forced him in any way to plead guilty.

In exchange for the court's promise that he would be sentenced to concurrent terms of twenty years to life imprisonment, petitioner pled guilty to both indictments in their entirety. On May 23, 2007, petitioner was sentenced, as a persistent violent felony offender, to concurrent prison terms of twenty years to life on each count.

### 4. Petitioner's New York State Court Motion to Vacate Judgment

On May 19, 2008, petitioner moved pursuant to New York's Criminal Procedure Law ("CPL") § 440.10 in the County Court, Nassau County, New York for an order vacating his judgment of conviction. In support of his motion, petitioner claimed that the court's accepting his guilty plea and sentencing him violated his rights under the due process and equal protection clauses of the United States Constitution. According to petitioner, during his sentencing he advised the court that he was innocent and had been pressured into pleading guilty by his attorney.

Petitioner also claimed that he was denied effective assistance of counsel because his attorney allegedly: (1) coerced him into pleading guilty; (2) withheld a copy of his driving abstract from him and lied to him about matters pertaining to his case; (3) prevented him from testifying before the grand jury; (4) improperly failed to argue at the suppression hearing that petitioner's statements were procured in violation of his right to counsel because he was on parole at the time of his arrest; (5) improperly failed to call Police Officer Detally as a witness at the suppression hearing; and (6) failed to communicate with certain "alibi witnesses" as requested by petitioner and failed to investigate sufficiently petitioner's case prior to his plea.

-4-

By Decision and Order dated September 22, 2008, the Honorable Meryl J. Berkowitz, County Court, Nassau County, denied petitioner's motion to vacate his judgment of conviction in its entirety. The court based its decision on the ground that petitioner's claims were procedurally barred pursuant to New York CPL § 440.10(2)(b). On December 4, 2008, petitioner's request for leave to appeal Judge Berkowitz's decision to New York's Appellate Division was denied.

### 5.    Petitioner's Direct Appeal

In his direct appeal to the Appellate Division, petitioner's attorney made the following claims: (1) the police lacked probable cause to arrest him; (2) the police unlawfully searched his cell phone; (3) the identification procedures were unduly suggestive and conducted improperly; (4) statements made by petitioner at the Robbery Squad were involuntary and inadmissible; and (5) petitioner was denied effective assistance of counsel because his attorney did not sufficiently argue on his behalf at the suppression hearing with respect to the speedy-trial application or during the hearing to determine whether he should be sentenced as a persistent violent felony offender.

By Order dated January 20, 2009, the Appellate Division affirmed the judgments resulting from the two indictments. It held that: "[t]he hearing court properly denied those branches of the [petitioner's] omnibus motion which were to suppress identification testimony and his post-arrest statements to law enforcement officials, as the evidence presented by the People demonstrated that the police had probable cause to arrest the [petitioner]." DE 1-2 p. 7. The appeals court also held that petitioner failed to establish that his statements were made involuntarily or that the photo array and lineup were unduly suggestive. Finally, the Appellate Division held that petitioner had forfeited appellate review of his ineffective assistance of

counsel claims which did not directly involve the plea-bargaining process and that his remaining contentions were meritless. Petitioner's subsequent application for leave to appeal to New York's Court of Appeals was denied on April 9, 2009. *Id.* at p. 6.

## B. Petitioner's Application for a Writ of Habeas Corpus

Petitioner now seeks a writ of habeas corpus pursuant to 28 U.S.C. § 2254. He requests habeas relief on the following grounds: (1) police violated his Fourth Amendment rights when they arrested him without probable cause; (2) the photo array and lineup were unduly suggestive; (3) his post-arrest statements were involuntary and unknowingly made and should have been suppressed; (4) the state court should not have accepted his guilty plea after he advised it during sentencing that he was innocent and had been pressured into pleading guilty by his attorney; and (5) that he was denied effective assistance of counsel because his attorney did not sufficiently argue on his behalf at the suppression hearing or during the hearing to determine whether he should be sentenced as a persistent violent felony offender.

In his motion to vacate judgment, petitioner made additional allegations of ineffective assistance of counsel and claimed his attorney: (1) coerced him into pleading guilty; (2) withheld a copy of his driving abstract and lied to him about matters concerning his case; (3) prevented him from testifying before the grand jury; (4) improperly failed to argue at the suppression hearing that because petitioner was on parole when he was arrested, his statements were procured in violation of his right to counsel; (5) improperly failed to call Police Officer Detally as a witness during the suppression hearing; and (6) did not communicate with certain "alibi witnesses" and failed to conduct an adequate investigation of petitioner's case prior to his plea.

## II.  DISCUSSION

**A.     Legal Standard for a Writ of Habeas Corpus by a Person in State Custody**

"In reviewing a state prisoner's habeas corpus petition pursuant to 28 U.S.C. § 2254, a federal district court makes an independent determination as to whether the petitioner is in custody in violation of his rights under the Constitution, or any laws and treaties of the United States." *McCool v. New York State*, 29 F. Supp. 2d 151, 157 (W.D.N.Y. 1998) (citing *Coleman v. Thompson*, 501 U.S. 722, 730 (1991)).

As amended by the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 ("AEDPA"), 28 U.S.C. § 2254(a) provides that a "district court shall entertain an application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  A federal court may grant a writ of habeas corpus to a state prisoner where the federal claim was "adjudicated on the merits" in state court only when adjudication of the claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.[3]

28 U.S.C. § 2254(d).

"An 'adjudication on the merits' is a "substantive, rather than a procedural, resolution of a

---

3.  "This standard of review, as opposed to the standard existing prior to the passage of the Antiterrorism and Effective Death Penalty Act (AEDPA) in 1996, is more deferential to state court decisions."  *Garry v. Greiner*, No. 01 Civ. 0848, 2003 WL 21436217, at *2 (S.D.N.Y. June 19, 2003).

federal claim.' " *Sellan v. Kuhlman*, 261 F.3d 303, 312 (2d Cir. 2001) (quoting *Aycox v. Lytle*, 196 F.3d 1174, 1178 (10th Cir. 1999)). A "state court 'adjudicate[s]' a state prisoner's federal claim on the merits when it (1) disposes of the claim 'on the merits,' and (2) reduces its disposition to judgment." *Id.* (quoting 28 U.S.C. § 2254(d)(1)). "When a state court does so, a federal habeas court must defer in the manner prescribed by 28 U.S.C. § 2254(d)(1) to the state court's decision on the federal claim—even if the state court does not explicitly refer to either the federal claim or to relevant federal case law." *Id.*

The Second Circuit Court of Appeals expressly adopted the "Fifth Circuit's succinct articulation of the analytic steps that a federal habeas court should follow in determining whether a federal claim has been adjudicated 'on the merits' by a state court." *Id.* at 314. In *Mercadel v. Cain*, 179 F.3d 271, 274 (5th Cir. 1999), the court held:

> [W]e determine whether a state court's disposition of a petitioner's claim is on the merits by considering: (1) what the state courts have done in similar cases; (2) whether the history of the case suggests that the state court was aware of any ground for not adjudicating the case on the merits; and (3) whether the state court's opinion suggests reliance upon procedural grounds rather than a determination on the merits.

Where a state court has not adjudicated a state prisoner's federal claim on the merits, the " '[the court applies] the pre-AEDPA standards and review[s] *de novo* the state court disposition of the petitioner's federal constitutional claims.' " *Garry v. Greiner*, No. 01 Civ. 0848, 2003 WL 21436217, at *2 (S.D.N.Y. June 19, 2003) (quoting *Cotto v. Herbert*, No. 01 Civ. 2694, 2003 WL 1989700, at *6 (2d Cir. May 1, 2003)).

Title 28 U.S.C. § 2254(e)(1) provides that the "determination of a factual issue made by a State court shall be presumed to be correct" and the petitioner "shall have the burden of rebutting

the presumption of correctness by clear and convincing evidence."

**B.**      **Petitioner's Application for a Writ of Habeas Corpus**

**1.**      **Petitioner's Fourth Amendment Claims**

Petitioner requests habeas relief on the ground that police arrested him without probable cause in violation of the Fourth Amendment of the United States Constitution.  He contends that this Court must determine whether the state court conducted a proper evidentiary hearing on petitioner's Fourth Amendment claims.  Petitioner argues that the process supplied to litigate his Fourth Amendment claims was meaningless and therefore collateral review is appropriate.

The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV.  With respect to a state prisoner's habeas petition alleging a Fourth Amendment violation, the Supreme Court has held that "where the State has provided an opportunity for full and fair litigation of a Fourth Amendment claim, the Constitution does not require that a state prisoner be granted federal habeas corpus relief on the ground that evidence obtained in an unconstitutional search or seizure was introduced at his trial."  *Stone v. Powell*, 428 U.S. 465, 494 (1976).  The Court reasoned that "[i]n this context, the contribution of the exclusionary rule, if any, to the effectuation of the Fourth Amendment is minimal, and the substantial societal costs of application of the rule persist with special force."  *Id.* at 494-95.

The Second Circuit elucidated on the *Stone* rationale in *Gates v. Henderson*, 568 F.2d 830

(2d Cir. 1977), where defendant's Fourth Amendment claim was raised for the first time in New York's Court of Appeals. The *Gates* court first noted that "any illegality surrounding the arrest would not render the evidence any less genuine or damning." *Id.* at 840. The court held: "To permit a hearing now eleven years later, after memories have long since dimmed, to determine what cause the police had at that time to make an arrest would be neither just to society nor effectuate the rationale of the exclusionary rule police deterrence." *Id.* Under such circumstances, federal intrusion is unwarranted. *Id.*

The *Gates* court then concluded that *Stone* permits habeas review of Fourth Amendment claims by state prisoners under two conditions: "If the state provides no corrective procedures at all to redress Fourth Amendment violations, federal habeas corpus remains available. It may further be that even where the state provides the process but in fact the defendant is precluded from utilizing it by reason of an unconscionable breakdown in that process, the federal intrusion may still be warranted." *Id.* (citations omitted). *See Shaw v. Scully*, 654 F. Supp. 859, 863 (S.D.N.Y. 1987) ("If the state provides no procedure for defendants to redress Fourth Amendment violations, federal habeas corpus remains available.").

Petitioner does not argue that New York did not provide adequate procedures to litigate his Fourth Amendment claims. As the government points out, New York provides defendants with the opportunity to litigate Fourth Amendment claims prior to trial pursuant to its CPL §§ 710.20-710.70. "[T]he 'federal courts have approved New York's procedure for litigating Fourth Amendment claims, embodied in N.Y. Crim. Pro. Law § 710.10 *et seq*. (McKinney 1984 & Supp. 1988), as being facially adequate.' " *Capellan v. Riley*, 975 F.2d 67, 70 n.1 (2d Cir. 1992) (quoting *Holmes v. Scully*, 706 F. Supp. 195, 201 (E.D.N.Y. 1989)). *See Shaw*, 654 F. Supp. at

864 ("New York provides criminal defendants an opportunity to litigate Fourth Amendment search and seizure issues before trial."); *Gates*, 568 F.2d at 837 ("The issue before us then is whether the State of New York provided Gates with the opportunity for full and fair litigation of his Fourth Amendment claim. That the state did so cannot be open to serious challenge.").

As to the second scenario under which habeas review is available, the Second Circuit has not delineated precisely what constitutes an "unconscionable breakdown" or when it occurs, but its "citations within *Gates* to *Frank v. Mangum*, 237 U.S. 309 (1915)[4] and to Paul M. Bator, *Finality in Criminal Law and Federal Habeas Corpus for State Prisoners*, 76 Harv. L. Rev. 441 (1963), 'illustrate the sort of 'disruption or obstruction of a state proceeding' typifying an unconscionable breakdown.' " *Donaldson v. Berbary*, No. 07 Civ. 6518, 2011 WL 939042, at *5 (W.D.N.Y. Mar. 16, 2011) (quoting *Capellan*, 975 F.2d at 70).

In his reply to the government's opposition, petitioner argues that the "process furnished was meaningless [because] the totality of state procedures did not provide him with rational conditions; collateral review by this federal court is appropriate." DE 12 p. 4. Petitioner admits that there was an evidentiary hearing which focused on the legality of the search and seizure of his cell phone (*id*. at p. 7-8), but complains that "the underlying circumstances of his case did not establish[] probable cause [and] ought to be reviewed and this Court should correct the unreasonable determination of the lower court." *Id.* at p. 10.

Where the "state provides a facially adequate procedure, a petitioner cannot gain review of

---

4. In *Frank v. Mangum*, 237 U.S. 309, 325-26 (1915), the lower court's denial of defendant's habeas petition claiming he was denied due process because his trial was dominated by the presence of an angry mob was affirmed by the Supreme Court. The Court held that the state had provided an adequate forum to address defendant's alleged due process violations.

a Fourth Amendment claim simply by arguing that the federal court would have reached a different result." *Shaw*, 654 F. Supp. at 863 (citing *Gates*, 568 F.2d at 840). In his reply, petitioner argues that the "lower court's decision was unreasonable in its findings of facts and conclusion of law, when it unreasonably failed to suppress the cell phones." DE 12 at p. 8 n.8.

Here, petitioner litigated his Fourth Amendment claims at his suppression hearing and on direct appeal to the Appellate Division. Thus, the state not only provided corrective procedures, petitioner employed them in arguing arrest without probable cause and unlawful seizure of his cell phone. Nor does petitioner identify any shortcomings in New York's procedures or any evidence of an "unconscionable breakdown" in utilizing those procedures. Because the state provides valid corrective procedures to litigate Fourth Amendment claims, this Court may not inquire any further into its findings and collateral review is unavailable. *See Gandarilla v. Artuz*, 322 F.3d 182, 185 (2d Cir. 2003) ("[T]he merits of a Fourth Amendment challenge are not reviewable in a federal habeas proceeding if a defendant has had a fair opportunity to litigate that question in State court."); *Graham v. Costello*, 299 F.3d 129, 134 (2d Cir. 1977) ("[O]nce it is established that a petitioner has had an opportunity to litigate his or her Fourth Amendment claim (whether or not he or she took advantage of the state's procedure), the court's denial of the claim is a conclusive determination that the claim will never present a valid basis for federal habeas relief."). Accordingly, his request for habeas relief based on the alleged Fourth Amendment violations is denied.

### 2. Petitioner's Claim that the Photo Array and Lineup Were Unduly Suggestive

Petitioner claims that the trial court denied him due process by allowing into evidence the photo array and lineup police conducted with witnesses Patricia Chrousery, Megan Chrousery and

Michael Palmieri. Petitioner takes issue with the "fillers" used in the identification procedures and argues that both were unduly suggestive and should have been suppressed by the hearing court. DE 1-3 p. 37.

In pertinent part, the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. "Reliability is the touchstone for the admission of eyewitness identification testimony pursuant to the Due Process Clause of the Fourteenth Amendment." *Brisco v. Ercole*, 565 F.3d 80, 88 (2d Cir. 2009). In *Raheem v. Kelly*, 257 F.3d 122, 133 (2d Cir. 2001), the court held that a two-step process should be employed in determining the reliability of eyewitness identifications. First, a court must "determine whether the pretrial identification procedures unduly and unnecessarily suggested that the defendant was the perpetrator." *Id*. Where no suggestive procedures are found, the "identification evidence presents no due process obstacle to admissibility" and "no further inquiry by the court is required." *Id.* (citation omitted). "If the court finds, however, that the procedures were suggestive, it must then determine whether the identification was nonetheless independently reliable." *Id.*

Petitioner argues that police suggestively showed the photo array to the eyewitnesses. He claims this is evidenced by the fact that they prepared a photo array which included his picture. He also claims that Patricia Chousery's photo identification was suggestive because it resulted from her seeing his picture in the newspaper and because she allegedly told Detective Hillman that all she saw was petitioner's nose and mouth because one of the perpetrators was wearing a mask. He argues that Megan Chousery twice failed to identify him and that witness Michael Palmieri claimed to have pulled a mask off of one of the three perpetrators but no mask was

-13-

produced in court. Petitioner contends that the hearing court's ruling against him in the suppression hearing was unreasonable and a denial of his due process rights.

### a.    *The Photo Array*

With respect to the photo array, testimony from the suppression hearing before the Honorable Joseph C. Calabrese, County Court, Nassau County, New York demonstrates the following. Detective Hillman testified that based upon a conversation he had with Patricia Chousery on November 7, 2005, he made arrangements to meet with her and her daughter, Megan Chousery, on November 9, 2005, at which time he took a statement from Patricia Chousery while Detective Nash took a statement from Megan Chousery. The statements were related to the Chouserys' identification of the defendant from a newspaper article. Based on the statements, the detectives arranged to meet with them on February 15, 2006.[5]

On that day, Detectives Nash and Hillman met with Patricia Chrousery and her ten-year old daughter Megan Chrousery at their home to show them a photopak containing a picture of petitioner. Detective Hillman testified that the photopak contained six pictures. The criteria used to select the remaining five filler photographs was male blacks of similar age, skin tone and hair style. Petitioner's photo was fourth in the photopak.

Detective Hillman sat with Mrs. Chrousery at the dining room table while Detective Nash, with an identical photopak, took Megan Chrousery into the family room. Hillman testified that he explained to Patricia Chrousery that he was going to show her some photos and asked her to tell

---

5. The transcript shows that Detective Hillman originally stated the date as February 15, 2005. Given the prior testimony identifying the year as 2005 and the subsequent testimony identifying the year as 2006, the Court presumes that Detective Hillman intended to say February 15, 2006.

him if she recognized anyone. After approximately six seconds, she pointed to the petitioner. Patricia Chousery memorialized her identification of petitioner by signing the back of the photo. Hillman HM pp. 87-92.

Detective Nash testified that after he, Megan Chousery and her father went into the family room, he told her he was going to show her some pictures and asked her to let him know if she recognized anyone. Within five seconds of looking at the array, Megan Chousery pointed to the picture of petitioner and identified him as the perpetrator. Both Megan Chousery and her father signed the picture. Nash HM pp. 153-157.

On or around February 15, 2006, another witness, Michael Palmieri, advised Detective Nash that he could identify the other person involved in his home invasion. Thus, prior to his appearance as a grand jury witness for the purpose of indicting petitioner's colleague Ernest Colon, Detective Hillman showed Palmieri the same photopak. After approximately two seconds, Palmieri put his finger on petitioner's photo and identified him as the perpetrator. Palmieri signed the back of the photo and gave a statement of identification. Hillman HM pp. 94-97.

### b.    *The Lineup*

With respect to the lineup, Detective Hillman testified that he communicated with Michael Palmieri to advise that him that the detectives would be conducting a court ordered lineup in regard to the case. He also made arrangements with Patricia and Megan Chousery to participate in the lineup, which would be conducted on July 12, 2006 at the Robbery Squad. He arranged for each person to view the lineup separately and for Megan to be accompanied by her father in light of her age. Neither of the witnesses had the opportunity to view petitioner prior to the lineup and

were supervised by a third detective while Detectives Hillman, Nash, Sorenson and Giambrone put the lineup together. After five black males were secured as fillers, petitioner was brought into the lineup room. At that time Detective Hillman and his attorney were told that petitioner could sit wherever he wanted, but that he had been number four in the photopak. With his attorney present, defendant chose the sixth position. Detective Hillman chose the positions of the five fillers.

Detective Nash escorted Megan Chousery into the viewing area of the lineup room. He testified that she viewed the lineup through the two-way glass for over sixty seconds. She then looked at Detective Nash and stated that she did not know, at which time she was escorted out of the room and back to her father. Nash HM pp. 159-162.

Detective Hillman escorted Patricia Chousery to the viewing area of the lineup room. Upon looking through the two-way glass and after approximately two seconds, she identified number six, the petitioner. At that time, Detective Hillman brought her to another detective so she could make a statement. Detective Hillman then escorted Palmieri from the conference room to the viewing room. Almost immediately upon looking in the glass, Palmieri picked number six. He was then taken to the Robbery Squad room to make a statement of identification. Hillman HM pp.102-113.

As set forth above, an application for a writ by a person in custody pursuant to a state court judgment may not be granted on any claim that was adjudicated on the merits unless: (1) the decision was contrary to or involved an unreasonable application of clearly established federal law as determined by the Supreme Court; or (2) the decision amounts to an unreasonable

determination of the facts given the evidence presented in state court. 28 U.S.C. § 2254(d)(1) & (2). As an initial matter, petitioner's identification procedure claims were adjudicated on their merits. The hearing court held a suppression hearing and New York's Appellate Division also passed on petitioner's claims on direct appeal. The hearing court denied petitioner's motion to suppress in its entirety and was affirmed by the Appellate Division. DE 1-2 p. 7.

The Court holds that petitioner has not rebutted by clear and convincing evidence the presumption of correctness that attaches to the state court's holding that his due process rights were not violated by the admission of the eyewitness identifications. After hearing the testimony set forth above, Judge Calabrese held: "the People have met their burden of establishing the reasonableness of the identification procedure. Defendant failed to prove, from the totality of the circumstances, that the showings were so suggestive as to violate due process." Decision dated Feb. 20, 2007 p. 5. Judge Calabrese also held that the Chouserys' viewing of the petitioner in the newspaper was not an arranged confrontation and did not taint their subsequent identification of him from the photopak. *Id.*

With respect to the lineup, the hearing court held that there "is no requirement that a lineup be comprised of individuals identical in appearance . . . only that fillers are of similar appearance that there is no substantial likelihood that [petitioner] would be singled out for identification." *Id.* (citations omitted). Indeed, the court noted that Megan Chousery was unable to pick petitioner out of the lineup despite immediately identifying him from the photopak. *Id.* at p. 6.

Furthermore, petitioner's arguments are factually and/or legally incorrect. The

government does not violate due process by showing a potential eyewitness a photopak containing

a suspect's picture as long as the fillers are reasonably similar to the suspect, as was the case here.

Additionally, Megan Chousery correctly and immediately identified petitioner in the photopak

and, thus, identified petitioner at least once. Third, there is no evidence in the record that Michael

Palmieri or the Chouserys identified petitioner as being the perpetrator in the mask. In fact,

testimony about DNA from the suppression hearing indicated that the mask that was pulled off

one of the perpetrators belonged to one Ernest Colon. Hillman HM p. 58.

Having found no evidence of the use of any suggestive procedures, there is no due process

obstacle to admitting the eyewitness identification from the photopak or lineup in this case.

Accordingly, petitioner's request for habeas relief on the ground that the hearing court violated his

due process rights by admitting the identification testimony is denied because he has not

demonstrated that the court misapplied federal law or that its decision was unreasonable based on

the facts before it.

### 3. Petitioner's Claim that his Post-Arrest Statements Should Have Been Suppressed

Petitioner claims that the hearing court's holding that his statements to police were

admissible and that he knowingly, intelligently and voluntarily waived his *Miranda* rights violated

his Fifth Amendment right against self-incrimination.

The Fifth Amendment, made applicable to the States by the Fourteenth Amendment,

provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against

himself." U.S. Const. amend. V.

"The test of a confession's voluntariness is whether an examination of all of the circumstances demonstrates that the conduct of 'law enforcement officers was such as to overbear [the defendant's] will to resist and bring about confessions not freely self-determined.'" *Delesline v. Conway*, 755 F. Supp. 2d 487, 501 (S.D.N.Y. 2010) (quoting *Rogers v. Richmond*, 365 U.S. 534, 544 (1961)). "A confession is not voluntary when obtained under circumstances that overbear the defendant's will at the time it is given." *United States v. Anderson*, 929 F.2d 96, 99 (2d Cir. 1991) (citing *Lynumn v. Illinois*, 372 U.S. 528, 534 (1963)). To determine whether a statement was voluntary, a court looks at the totality of the circumstances under which the confession was made. *Id.* (citing *Arizona v. Fulminante*, 499 U.S. 279, 282-89 (1991)).

Thus, a criminal defendant's "background and experience, the conditions of his interrogation and the conduct of the law enforcement officers" must be considered. *United States v. Ruggles*, 70 F.3d 262, 265 (2d Cir. 1995). *See Johnson v. Zerbst*, 304 U.S. 458, 464 (1938) (holding that courts must examine "the particular facts and circumstances surrounding that case, including the background, experience, and conduct of the accused" when deciding whether a criminal defendant made "an intentional relinquishment or abandonment of a known right or privilege"); *Green v. Scully*, 850 F.2d 894, 902 (2d Cir. 1988) ("In applying the totality of the circumstances test, those factors that a court should consider to determine whether an accused's confession is voluntary center around three sets of circumstances: (1) the characteristics of the accused, (2) the conditions of interrogation, and (3) the conduct of law enforcement officials.").

Factors to be considered include: the age of the accused; his level of education; level of intelligence; lack of advice regarding the accused's constitutional rights; length of detention; the nature of the questioning and whether it is prolonged and repeated; and the use of physical

punishment including food and sleep deprivation.  *See generally Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973) (citations omitted).

In light of petitioner's suppression hearing in state court and his appeal to the Appellate Department, petitioner's claim was adjudicated on the merits and this Court must defer to the state court's decision on petitioner's Fifth Amendment claim.  That is, unless the state courts' decisions regarding petitioner's statements were "contrary to" or "an unreasonable application of" clearly established federal law or if the decisions were "based on an unreasonable determination of the facts," the decisions are entitled to a presumption of correctness which petitioner must rebut by clear and convincing evidence.  28 U.S.C. § 2254(d) & (e).

Petitioner argues that he lacked sophistication at the time he made his statements and, consequently, the hearing court incorrectly held that his statements were voluntarily, intelligently and knowingly made.  He also contends that he did not understand the scope of the fundamental rights he relinquished when he allegedly made spontaneous statements upon his arrest and when he waived his *Miranda* rights.  Consequently, according to petitioner, his incapacity to fully comprehend the legal implications rendered his waiver invalid.

### *Petitioner's Arrest and Detention*

Testimony from the suppression hearing demonstrates the following.  Petitioner was arrested in Flatbush, Brooklyn, New York by the Brooklyn Robbery Squad on November 4, 2005 at approximately 5:00 p.m.  At around 6:00 p.m. that evening, Detective Hillman and his partner Detective Nash took custody of petitioner, who was handcuffed.  Hillman testified that petitioner appeared in good health and had no injuries, nor did he complain of being injured.  Detective

Hillman introduced himself and advised petitioner that he was under arrest for home invasion robberies in Nassau County. Still handcuffed, he was placed in the rear seat of an unmarked police car with Hillman seated next to him while Nash drove to the Robbery Squad in North Bellmore. During the ride, petitioner told Hillman that there was no Pattern 13 gang. Hillman HM pp. 46-51.

Once they arrived, petitioner was placed in an interview room and his right hand was handcuffed to a U-bolt on the desk at approximately 7:10 p.m. At 8:20 p.m., both detectives entered the room at which time Detective Hillman reintroduced himself and read petitioner his constitutional rights, from a standardized rights card, in their entirety. Petitioner was asked if he understood his rights and whether he was willing to answer some questions. He responded "yes" to both questions, but declined to both read and sign the card because he said he knew his rights. Detective Hillman wrote down his responses on the card and both he and Nash signed and dated it. Hillman HM pp.60-64.

When the detectives began questioning petitioner, he appeared in good health with no signs of injury and with a normal demeanor. At 9:40 p.m., petitioner had a bathroom break. The detectives continued questioning petitioner approximately ten minutes later in the same interview room with petitioner handcuffed to the desk. His demeanor was unchanged. Detective Hillman was about two and one-half feet away from petitioner and Detective Nash was approximately four and one-half feet away. The interview continued until 11:10 p.m., at which time the detectives gave defendant a soda and a cigarette. Hillman HM pp. 66-70.

The interview resumed thereafter and at 12:20 a.m., another detective came into the room

to say that petitioner's girlfriend, who was with him when he was arrested in Flatbush, was leaving. The detectives allowed petitioner to speak to his girlfriend until she left at approximately 12:40 a.m. At around 1:00 a.m., Detective Hillman made arrangements for petitioner to listen to an audio recording of his associate, Eugene Elmore, who had called Crime Stoppers sometime in the previous weeks. At about 1:45 a.m., Detectives Hillman and Nash concluded the interview, leaving petitioner in the interview room, handcuffed as has been described. According to Detective Hillman, other detectives spoke with petitioner after he left. Hillman HM pp. 73-80.

As a result of a conversation with Detective Comiskey, Detective Hillman returned to the interview room at 7:10 a.m. At that time, petitioner continued to be in good health with no injuries or complaints. While speaking with Detectives Hillman and Comiskey, petitioner stated that if they could guarantee him seven years, he would give them seven home invasions. After both detectives told him they could not offer him a deal, petitioner told them to find someone who could. The detectives had no further conversation with him and Hillman testified that petitioner was then interviewed by Detective Sergeant Giambrone, who was the last member of the Robbery Squad to interview petitioner. Hillman also testified that during the time petitioner was in custody, no one made any promises to him in exchange for his statements. Nor did anyone threaten or strike him. Petitioner never indicated that he no longer wished to speak to the detectives or asked to speak to a lawyer. Hillman HM pp. 81-84.

Detective Hillman's statements regarding the arrest and detention of petitioner were not challenged on cross-examination by petitioner's attorney, Paul Zsuffa.

Detective Comiskey testified that when he entered the interview room at 6:45 a.m.,

petitioner was handcuffed by one hand to the desk and appeared to be conscious, alert and was not complaining about anything. Detective Comiskey left the room to confer with Detective Hillman. Both detectives reentered the interview room at approximately 7:10 a.m. At about 7:50 a.m., Detective Comiskey allowed petitioner to call his girlfriend. The next and last time Detective Comiskey saw petitioner was at 10:45 a.m., when he took him to the restroom. The detective also testified that petitioner was not threatened or struck and he never indicated that he no longer wished to speak to police. Comiskey HM pp. 176-181.

On cross-examination, petitioner's attorney, Mr. Zsuffa, asked Detective Comiskey if he was aware that petitioner had been in custody for approximately twelve hours when the detective interviewed him. The detective responded that he was not so aware. Comiskey HM p. 183.

Detective Sergeant Giambrone testified that he came into contact with petitioner in the interview room at approximately 9:40 a.m. at which time he observed that petitioner was handcuffed to the desk by one hand. At that time, he appeared relaxed without any visible injuries or complaints. Petitioner told Detective Sergeant Giambrone that if the government could promise him seven years in writing, he would give him "the full deck." The detective advised petitioner he was unable to help him in that way, but that his attorney could conference with the District Attorney's Office on the matter. Petitioner responded that he had no lawyer, at which time Detective Sergeant Giambrone told him that a lawyer could be provided for him. Petitioner then asked for a cup of coffee. The detective left the room and returned with a cup of coffee and two donuts. He told petitioner to drink and eat and left the room.

When Detective Sergeant Giambrone returned to the interview room ten or twelve minutes

later, petitioner again reiterated that he wanted a promise of seven years in writing and he would tell everything. The detective again explained to him that he could not promise him anything in writing and petitioner asked if he could speak to his father, at which time the detective dialed the telephone number for him. At approximately 10:30 a.m., petitioner told Detective Sergeant Giambrone that he would not talk without something in writing and their meeting ended. The detective testified that he made no promises to petitioner for any of his statements, nor did he threaten him in any way. Giambrone HM pp. 192-197.

When cross-examined by Mr. Zsuffa, Detective Sergeant Giambrone testified that he was aware that petitioner had been picked up by Nassau County police officers on November 4th and charged with the Manhasset robbery. He also testified that when he first met petitioner at 9:30 a.m. on November 5, 2005, he was uncertain if he knew that petitioner had been in custody for approximately fourteen hours. Giambrone HM pp. 198-199.

In its written decision, the hearing court held that petitioner's statements at the Flatbush precinct and in the squad car on the way back to Nassau from Brooklyn were spontaneous. Decision dated Feb. 20, 2007. That court also held that petitioner's statements at the Robbery Squad were made after defendant was given his Miranda warnings, which he knowingly, intelligently and voluntarily waived. *Id.* The Appellate Division affirmed the hearing court and held that petitioner "failed to establish that in making his statements to the police, his 'will was overborne and his capacity for self-determination critically impaired.' " DE 1-2 p. 8 (citations omitted).

Considering the length of the detention, the fact that petitioner was given several breaks

during which he smoked cigarettes, drank soda and coffee, ate donuts, made phone calls and used the bathroom, petitioner has not demonstrated by clear and convincing evidence, or indeed any evidence, that the hearing court improperly held that his statements were voluntary and that he voluntarily waived his Miranda rights. Rather, the testimony adduced at the suppression hearing demonstrates that petitioner was arrested, handcuffed and that his rights were read to him prior to questioning. During his time in custody in the Robbery Squad interview room, he was allowed to drink, smoke, eat, use the restroom and permitted to make at least three phone calls. Detectives also allowed him to talk to his girlfriend before she left the building. The testimony also shows that petitioner consistently appeared to be in good health with no signs of any injuries and without any complaints. Even after being questioned for at least twelve hours, petitioner refused Detective Sergeant Giambrone's offer to obtain a lawyer for him.

Nor was this petitioner's first arrest. Detective Sergeant Giambrone testified that petitioner insisted that any deal be in writing because he had been double crossed by detectives who arrested him in the late 1970's for burglary. In addition, petitioner offered to give police information regarding the home invasions if they struck a deal with him. Thus, petitioner was willing to voluntarily make incriminating statements about himself for the right price–hardly the act of a man whose will was overborne.

Moreover, under New York law, a "[j]udge must find voluntariness beyond a reasonable doubt before the confession can be submitted to the trial jury." *People v. Huntley*, 204 N.E.2d 179, 183 (N.Y. 1965). The Supreme Court, however, has held that the Constitution requires the government to prove the voluntariness of a statement by the lesser preponderance of the evidence standard. *Lego v. Twomey*, 404 U.S. 477, 489 (1972). Thus, the hearing court found petitioner's

statements spontaneous and voluntary by a higher standard than required under federal law.

Considering all of the foregoing, there is simply no evidence in the record or in petitioner's papers that his statements were not made of his own free will. Hence, based on the totality of the circumstances, the hearing court's decision was neither contrary to or an unreasonable application of federal law. Nor was it an unreasonable determination of the facts based on applicable law. Accordingly, based on the circumstances of petitioner's post-arrest detention, his failure to show that his will was overborne by the government and his failure to demonstrate that his *Miranda* wavier was invalid, his request for a writ of habeas corpus on his Fifth Amendment claim is hereby denied.

### 4. Petitioner's Claim that the State Court Erred in Accepting His Guilty Plea Because His Attorney Forced Him to Plead Guilty

Petitioner claims that his rights were violated under the due process and equal protection clauses of the United States Constitution because at his sentencing hearing, he informed the court that he was innocent and had been coerced into pleading guilty by his attorney. Petitioner raised these issues in the state court by his motion to vacate judgment pursuant to New York's CPL § 440.10.

The Supreme Court has "made clear that, absent a showing of cause and prejudice or a fundamental miscarriage of justice, a federal habeas court may not review a federal claim that has been defaulted in state court pursuant to an independent and adequate state procedural ground." *Hemphill v. Senkowski*, No. 02 Civ. 7093, 2004 WL 943567, at *8 (S.D.N.Y. May 3, 2004) (citing *Coleman v. Thompson*, 501 U.S. 722, 750 (1991)). As a result, federal courts considering a

habeas petition have held that New York's CPL § 440.10(2)(b)[6] "generally preclude[s] a defendant from raising, in a collateral proceeding, trial errors that could have been presented on direct appeal and have been recognized as 'independent and adequate' state procedural grounds." *Id.* (quoting *Grey v. Hoke*, 933 F.2d 117, 120 (2d Cir. 1991)). *See Vargas v. Keane*, 86 F.3d 1273, 1280 (2d Cir. 1996) ("As the district court correctly noted, the petitioner's procedural default constitutes an adequate and independent state law ground for rejection of his claim."); *Garner v. Superintendent*, No. 10 Civ. 1406, 2012 WL 3929944, at *4 (N.D.N.Y. Sept. 10, 2012) ("The denial of a claim under CPL § 440.10(2)(b) rests upon an independent and adequate state ground and this claim is therefore procedurally defaulted.") (citing cases).

When the state court has dismissed a petitioner's federal claim on an adequate and independent state ground, "habeas review of that claim is procedurally barred unless the petitioner can demonstrate either (1) cause for the default and prejudice attributable thereto; or (2) that the failure to consider the federal claim will result in a fundamental miscarriage of justice (i.e., a constitutional error has probably resulted in the conviction of someone who is actually innocent)." *Ponder v. Conway*, 748 F. Supp. 2d 183, 188 (W.D.N.Y. 2010) (citing *Coleman*, 501 U.S. at 750). *See Vargas*, 86 F.3d at 1280 (holding that federal review of such claims is "barred unless the petitioner can demonstrate cause for the procedural default and prejudice flowing therefrom . . . or that 'failure to consider the claim [ ] will result in a fundamental miscarriage of justice' ")

---

6.  New York's Criminal Procedure Law § 440.10(2)(b) provides that a court must deny a motion to vacate a judgment when:

> The judgment is, at the time of the motion, appealable or pending on appeal, and sufficient facts appear on the record with respect to the ground or issue raised upon the motion to permit adequate review thereof upon such an appeal.

(internal citations omitted) (quoting *Coleman*, 501 U.S. at 750).

On or about May 19, 2008, a few months after his direct appeal had been perfected, petitioner moved pursuant to New York's CPL § 440.10 to vacate the judgment of the state court on the grounds that the court's acceptance of his guilty plea and imposition of sentence violated his constitutional rights. He also claimed he was denied effective assistance of counsel. Subsequently, the Honorable Meryl J. Berkowitz, County Court, Nassau County, New York, held that petitioner's claims had been raised in his then-pending direct appeal and were "procedurally barred" and that he was "precluded from raising them" under CPL § 440.10(2)(b). DE 1-2 p. 2.

Petitioner argues that "in his expression and in his own words, he expressed his dissatisfaction with the plea and with counsel's performance" during his sentencing hearing and therefore, he has satisfied both cause and prejudice. DE 12 p. 32. Thus, he contends, his claim is not procedurally barred and this Court should consider it on the merits. He argues further that failure to consider the claim will result in a miscarriage of justice. *Id.* at p. 33.

As the government points out, however, petitioner does not identify any cause for his procedural default, i.e., he does not allege any reason for his failure to present his claim that he was coerced into pleading guilty on direct appeal, despite making the allegation a few months later in his CPL § 440.10 motion. Furthermore, sufficient facts appear on the record from the sentencing minutes for the Appellate Division to have decided this claim.

Nor has petitioner shown that denying his request for habeas relief on these grounds would result in a miscarriage of justice. Contrary to his claims in the motion to vacate that he told the sentencing judge that he was "innocent" and had been coerced into pleading guilty, the sentencing

minutes demonstrate that petitioner actually said:

> I pleaded guilty to these charges because basically I had no choice. . . .
> And–um–you know I find that unbelievable where at this time–you know what I'm
> saying because that person never looked into my eyes, my eyes personally. . . .  I
> plead guilty or, you know, I stand up and take whatever time the judge has to give.

DE 12 p. 31.  Given his statement to the sentencing court, petitioner did not advise the court that

he was coerced into pleading guilty or present any evidence that he is unlawfully imprisoned as a

result of a constitutional error.  Denying habeas relief will not, therefore,  result in a miscarriage

of justice.

Accordingly, for the foregoing reasons, petitioner's request for habeas relief on this claim

is denied because the state court rejected petitioner's constitutional claim on a state law ground

independent of the federal question and adequate to support its judgment.

### 5.     Petitioner's Ineffective Assistance of Counsel Claims

By direct appeal to New York's Appellate Division, petitioner claimed that his Sixth

Amendment right to counsel was violated.  Petitioner's appellate attorney argued that his trial

attorney rendered ineffective assistance of counsel during: (1) the suppression hearing; (2) the

New York CPL § 30.30 hearing; and (3) the hearing to determine whether petitioner should be

sentenced as a persistent violent felony offender.

Meanwhile, in his CPL § 440.10 motion to vacate the judgment filed approximately three

months after his direct appeal was perfected, petitioner alleged he was denied ineffective

assistance because his attorney: (1) coerced him into pleading guilty; (2) withheld a copy of his

driving abstract; (3) prevented him from testifying before the grand jury; (4) failed to argue at the

suppression hearing that his post-arrest statements were procured in violation of his right to

counsel because he was on parole at the time of his arrest; (5) failed to call Police Officer Detally

as a witness at the suppression hearing; and (6) failed to communicate with certain alibi witnesses

and properly investigate this case prior to petitioner's guilty plea.

### a. Legal Standard

In part, the Sixth Amendment of the Constitution provides: "In all criminal prosecutions,

the accused shall . . . have the Assistance of Counsel for his defence." U.S. Const. amend. VI.

"The purpose of the Sixth Amendment guarantee of counsel is to ensure that a defendant has the

assistance necessary to justify reliance on the outcome of the proceeding." *Strickland v.

Washington,* 466 U.S. 668, 691-92 (1984).

"When a convicted defendant complains of the ineffectiveness of counsel's assistance, the

defendant must show that counsel's representation fell below an objective standard of

reasonableness." *Id.* at 687-88. Furthermore, "any deficiencies in counsel's performance must be

prejudicial to the defense in order to constitute ineffective assistance under the Constitution." *Id.*

at 692. A "defendant must show that there is a reasonable probability that, but for counsel's

unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.

When evaluating an ineffective assistance claim, a court "must indulge a strong

presumption that counsel's conduct falls within the wide range of reasonable professional

assistance" and a defendant bears the burden of overcoming the presumption that counsel's

decisions were sound. *Id.* at 689. Accordingly, "[j]udicial scrutiny of counsel's performance

must be highly deferential." *Id.*

### b.     *Petitioner's Ineffective Assistance Claims Raised on Direct Appeal*

By direct appeal to New York's Appellate Division, petitioner's counsel raised three

claims with respect to ineffective assistance of counsel.  He contended that petitioner's trial

attorney failed to argue on his behalf during the suppression hearing, the CPL § 30.30 hearing and

the hearing to determine whether petitioner should be sentenced as a persistent violent felony

offender.

Petitioner argues that his ineffective assistance of counsel claims before the appellate court

are open to federal review because that court addressed the claims on their merits.  Contrary to his

argument, however, the state appellate court dismissed petitioner's ineffective assistance of

counsel claims on the grounds they did not involve the plea-bargain process.  As explained below,

his claims are procedurally defaulted from review by this Court.

Under firmly established New York State law, "a guilty plea results in the forfeiture of all

claims unrelated to the validity of a petitioner's plea" and such unrelated claims are procedurally

barred.  *Silent v. Perlmann*, No. 07 Civ. 4525, 2008 WL 5113418, at *6 (E.D.N.Y. Nov. 25,

2008).  *See People v. Petgen*, 435 N.E.2d 669, 671 n.3 (N.Y. 1982) ("Indeed it may be

persuasively argued that even if there were but one attorney, if the ineffective assistance of

counsel did not infect the plea bargaining process itself, the defendant, having admitted

commission of the criminal act by his guilty plea, should be held to have forfeited any claim of

ineffective assistance of counsel not directly involved in the plea bargaining process."); *People v.*

*Deale*, 813 N.Y.S.2d 311, 312 (N.Y. App. Div. 2006) (holding that when a defendant pleads

guilty, his or her ineffective assistance of counsel claims that do not directly involve the plea-

bargain process are not subject to review on appeal).

As discussed above, when a state court rejects a claim under independent and adequate state law grounds, the claim is procedurally defaulted in federal court and a petitioner is precluded from raising that claim in a habeas petition unless he or she can demonstrate: (1) cause for the default and prejudice; or (2) that failure to consider the claim will result in a fundamental miscarriage of justice. Here, the Appellate Division held that petitioner's Sixth Amendment claims were barred under New York law because they did not directly involve the plea-bargain process–an adequate and independent state law ground. Thus, this Court may not consider petitioner's claim that his attorney rendered ineffective assistance of counsel while representing petitioner at the hearings unless he can demonstrate cause for the default with resulting prejudice or that he is actually innocent and being detained as the result of a constitutional error.

Petitioner has not shown cause for the default and nor can he by virtue of the fact that he pled guilty and a guilty plea in New York precludes review of ineffective assistance of counsel claims unrelated to the plea bargain process.

Furthermore, petitioner has not made any showing that failure to consider his Sixth Amendment claims will result in a miscarriage of justice. Nothing in the record demonstrates that petitioner was actually innocent of his crimes but was incarcerated because of his attorney's alleged ineffective assistance. In fact, he reiterated his guilt at his sentencing hearing (see DE 12 p. 31). Accordingly, the appellate court properly dismissed petitioner's constitutional claims on adequate state law grounds that are independent of the federal question. This Court may not disturb those rulings on the record before it.

c.      ***Petitioner's Remaining Ineffective Assistance of Counsel
Grounds***

Petitioner also raised ineffective assistance claims in his motion to vacate judgment

pursuant to New York's CPL § 440.10.  He alleged that his attorney withheld a copy of his driving

abstract; prevented him from testifying before the grand jury; failed to call or communicate with

certain witnesses identified by petitioner; and failed to properly investigate the case prior to

petitioner's guilty plea.  The Honorable Meryl J. Berkowitz denied petitioner's motion to vacate,

holding that his ineffective assistance claims were on direct appeal and therefore procedurally

barred from being raised in a motion to vacate the judgment.

Petitioner's perfected appeal did not specifically raise these remaining grounds.  Petitioner

contends that he was unaware of some of the facts to support these additional ineffective

assistance claims and therefore, raised them in the motion to vacate judgment while his direct

appeal was pending.

Even assuming petitioner was unaware of all of the facts to support these additional

grounds, when a defendant pleads guilty in New York, he or she forfeits appellate review of any

ineffective assistance of counsel claims not directly related to the plea process.  Thus, even if

petitioner's additional Sixth Amendment claims were before the Appellate Division, it would

have declined to review these claims on the grounds that petitioner forfeited review of said claims

because they are unrelated to the plea process.  *See supra* Part II.B.5.b.  *See Harris v. Reed*, 489

U.S. 255, 262 (1989) ("[A]n adequate and independent finding of procedural default will bar

federal habeas review of the federal claim, unless the habeas petitioner can show 'cause' for the

default and 'prejudice attributable thereto . . . .'") (citing *Murray v. Carrier*, 477 U.S. 478, 485

(1986)); *Petronio v. Walsh*, 736 F. Supp. 2d 640, 652 (E.D.N.Y. 2010) ("Under the procedural default rules, 'even when a petitioner presents a colorable federal constitutional claim, federal habeas review is barred if the claim was denied by a state court on a state procedural ground that is both 'independent' of the merits of the federal claim and an 'adequate' basis for the court's decision.' ") (quoting *Fernandez v. Smith*, 558 F. Supp. 2d 480, 489 (S.D.N.Y. 2008)). *See also Tollet v. Henderson*, 411 U.S. 258, 267 (1973) (holding that after a defendant has admitted guilt, he or she may not raise "independent claims relating to the deprivation of constitutional rights that occurred prior to the entry of a guilty plea"). Consequently, the bulk of these additional ineffective assistance of counsel grounds would have been barred on adequate and independent state law grounds and therefore, are not subject to federal review.

With respect to petitioner's claim that his attorney rendered ineffective assistance by coercing him to plead guilty, the Court shall presume that this claim is directly related to the plea bargain process and the voluntariness of petitioner's guilty plea. Because the state court has not adjudicated petitioner's federal claim on the merits, this Court must apply the pre-AEDPA standards and review this ineffective assistance of counsel claim *de novo*. *Garry v. Greiner*, No. 01 Civ. 0848, 2003 WL 21436217, at *2 (S.D.N.Y. June 19, 2003). To prevail under *Strickland*, petitioner must demonstrate that his attorney's performance prejudiced him because the representation fell below an objective standard of reasonableness. Prejudice is established by a showing that but for counsel's ineffective assistance, the proceeding would have turned out differently.

Testimony from petitioner's plea allocution demonstrates that petitioner was: (1) satisfied with his attorney's representation; (2) aware of his right to go to trail; and (3) that no one forced

him to plead guilty or made any promises in exchange for his guilty plea, except for the court's promise that he would be sentenced to concurrent terms of twenty years to life on both indictments if he took a plea. Petitioner has not produced any evidence contradicting the foregoing except his own conclusory statements that his attorney coached him to lie during the plea allocution. In fact, when given the opportunity to speak on his behalf during sentencing, petitioner never proclaimed his innocence. Rather, he stated that he pled guilty to the charges because he basically had no choice and that he was prepared to take "whatever time the judge has to give." DE 12 p. 31.

Given the foregoing, petitioner has not demonstrated that but for counsel's alleged ineffective assistance in coercing him to take a plea, he would not have pled guilty or that his guilty plea was involuntary. Consequently, petitioner has not and cannot establish prejudice resulting from counsel's purported ineffectiveness because he never took the opportunity to advise the court that his plea resulted from coercion by his attorney. Thus, petitioner's allocution and sentencing would not have turned out differently. Petitioner's request for habeas relief on his ineffective assistance claim that he was coerced by his attorney into pleading guilty is, therefore, denied.

### III.  CONCLUSION

Petitioner's Fourth Amendment claims are denied because New York State provides a valid, corrective procedure to litigate such claims and, consequently, they are not reviewable by a federal district court. His request for habeas relief on due process grounds based on the admission of the photo array and lineup into evidence is denied because petitioner failed to prove that either

identification procedure was unduly suggestive.  The request for habeas relief for the state court's alleged failure to suppress his post-arrest statements in violation of the Fifth Amendment is also denied because the state court's decisions were not an unreasonable application of federal law.

Petitioner's claim that the state court erred in accepting his guilty plea because his attorney forced him to plead guilty is denied because the state court's decision rested on adequate state law grounds that are independent of the federal question.  Petitioner's Sixth Amendment ineffective assistance of counsel claims on direct appeal before the Appellate Division are likewise denied on adequate and independent state law grounds.  Petitioner's ineffective assistance claims not before the Appellate Division are denied on the grounds they do not directly involve the plea-bargain process.  Finally, his claim that his attorney coerced him into pleading guilty is denied because petitioner has not demonstrated prejudice.

For all of the foregoing reasons, petitioner's application for a writ of habeas corpus is hereby **DENIED**.

**SO ORDERED**.

Dated: October 18, 2013
        Central Islip, New York

_____/s/_____
Thomas C. Platt, U.S.D.J.